972 A.2d 354

**Andre Jerome ELLIOTT**

v.

**STATE of Maryland.**

**No. 1963 Sept.Term, 2007.**

Court of Special Appeals of Maryland.

June 1, 2009.

---

694

Robert M. Cary and Katherine M. Turner (David M. Zinn, Williams & Connolly, LLP, on the brief), Washington, DC; (Public Defender Specially Assigned, Nancy S. Forster, on brief) Baltimore, for appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: HOLLANDER, ZARNOCH and MATRICCIANI, JJ.

HOLLANDER, Judge.

Kellie McCullough, the estranged wife of Andre Jerome Elliott, appellant, suffered multiple stab wounds when she was attacked by appellant on February 5, 2006. Mr. Elliott was subsequently indicted on a variety of charges, including attempted first-degree murder of Ms. McCullough. Following a jury trial in the Circuit Court for Montgomery County in July 2007, appellant was convicted of attempted second-degree murder, in violation of Md.Code (2002, 2006 Supp.), § 2–206 of the Criminal Law Article ("C.L."); first-degree burglary, in violation of C.L. § 6–202; and first-degree assault, in violation of C.L. § 3–202. The court sentenced appellant to a total term of fifty years' incarceration.[1]

1. The court declared a mistrial as to attempted first-degree murder, because the jury was unable to reach a unanimous verdict. The court initially sentenced appellant to consecutive terms of thirty years for attempted second-degree murder, twenty-five years for first-degree assault, and twenty years for first-degree burglary, for a total of seventy-five years. On December 12, 2008, a sentencing review panel for the circuit court merged appellant's assault conviction with his attempted murder conviction, thereby reducing his sentence to fifty years.

This appeal followed. Appellant poses four questions,[2] which we quote:

1. Did the trial court err in empaneling the jury after the State admitted that it had exercised peremptory challenges on the impermissible basis of gender?

2. Did the trial court err in refusing to continue the trial to remedy the prejudice arising from the State's last-minute and incomplete production of evidence required to be disclosed under Maryland Rule 4–263(b)?

3. Did the trial court err in refusing to dismiss the indictment or afford other relief to remedy the State's bad-faith failure to preserve evidence?

4. Did the trial court err in refusing to clarify the jury's confusion about the intent requirement of attempted murder?

For the reasons set forth below, we conclude that the State improperly exercised its peremptory challenges. Therefore, we shall vacate the judgment and remand for a new trial. Accordingly, we decline to address Questions Two and Four, as they are not likely to recur. For the benefit of the parties and the court, however, we shall address the third question.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

 Elliott and McCullough were married in August 2004. In June 2005, after the parties had already separated, McCul-

---

**2.** Appellant initially included a fifth question, pertaining to the court's failure to merge for sentencing purposes the convictions for attempted second-degree murder and first-degree assault. But, in his reply brief, appellant conceded that this issue is now moot, based on the action of the sentencing review panel. The State agrees, as do we. *See In re Julianna B.,* 407 Md. 657, 666–68, 967 A.2d 776 (2009) (discussing mootness); *Albert S. v. Dep't of Health & Mental Hygiene,* 166 Md.App. 726, 743–44, 891 A.2d 402 (2006) (same).

**3.** Numerous witnesses testified at trial. In view of the issues presented, we need not include a detailed summary of all the evidence adduced at trial. Instead, we shall include "only the portions of the trial evidence necessary to provide a context for our discussion...." *Washington v. State,* 180 Md.App. 458, 461 n. 2, 951 A.2d 885 (2008); *see Singfield v.*

lough purchased a house in Germantown. About "two or three months" later, McCullough told Elliott that he could "stay" at her house until he could "get [him]self together." He later refused to leave. Accordingly, on January 3, 2006, McCullough gave Elliott thirty days' notice to vacate her house. On January 27, she obtained a temporary protective order against Elliott because he was volatile, abusive, and had threatened to kill her. She obtained a final protective order on February 3, 2006.

At around 7:17 a.m. on Sunday, February 5, 2006, Elliott left a voice message for McCullough, stating that he needed to talk to her. McCullough testified that she "got out of the bed" at around 8 a.m. that morning. She soon heard banging coming from downstairs; "immediately" she "knew" it was Elliott. She retreated to the bathroom, but Elliott "kicked through the door" and started stabbing her. McCullough screamed, hoping the neighbors would hear her. With her hand, she tried to block the knife. Nevertheless, Elliott stabbed her hand and then stabbed her wrist, where the knife was stuck until Elliott yanked it free. Elliott also stabbed McCullough in the chest. Blood was everywhere.[4]

---

*State*, 172 Md.App. 168, 170, 913 A.2d 671 (2006), *cert. denied*, 398 Md. 316, 920 A.2d 1060 (2007); *Martin v. State*, 165 Md.App. 189, 193, 885 A.2d 339 (2005), *cert. denied*, 391 Md. 115, 892 A.2d 478 (2006).

We note that two attorneys represented appellant at a motions hearing on December 27, 2006, and two other attorneys represented him at another motions hearing on July 20, 2007, and at trial. For ease of discussion, we shall refer to them collectively as "defense counsel" or "appellant's counsel," unless otherwise noted. Similarly, two prosecutors attended the motions hearings and later tried the case. We shall refer to them collectively as the "prosecutor" or the "State."

4. Willie Clifton Blair, M.D., a general surgeon, treated McCullough at Suburban Hospital on February 5, 2006. He testified that she had a total of fourteen lacerations, which were inflicted on the right hand, left upper extremity, the breast, and left arm. Moreover, her bones were fractured in her hand. In addition, a CT scan revealed air around the heart and under the diaphragm.

Harrison Solomon, M.D., a hand surgeon, operated on McCullough's hand on February 5, 2006. He was received "as an expert in orthopaedic surgery, and specifically in surgery involving the hand and upper extremities." Dr. Solomon testified that the victim suffered a

McCullough testified that when she "woke up" the knife was still in her chest. She pulled it out and slid to the bottom of the stairs, where she was able to reach her cell phone. She called 911, and told the dispatcher she had been stabbed. But, McCullough did not recall whether she mentioned that it was her husband who had stabbed her. She lay on the floor, which was covered in glass, and was in and out of consciousness. When the police arrived, McCullough identified Elliott as the person who had stabbed her. She also indicated that he had been wearing a blue or black crew neck shirt, a coat, boots, and "a New York hat."

The prosecutor asked: "Who is the person who did this to you?" McCullough responded: "Andre Elliott." She also identified the knife used during the attack and a New York Yankees hat recovered from appellant's car.

On cross-examination, McCullough confirmed that "[t]here was a diary that was in [her] apartment that was taken ... [a]nd sometime after the incident ... given back." She also agreed that she received "a copy or copies of the diary" from Detective Ana Erazo, and was not instructed to preserve the material. McCullough subsequently "discarded the diary" and "shredded the copies...." Defense counsel did not ask about the contents of the diary.[5]

Shortly after 8 a.m. on February 5, 2006, Patrol Officer John Chucoski responded to McCullough's 911 call. The front door of the house was locked, but some of the windows were

---

"through and through" injury to the hand; the stabbing penetrated the skin, three bones, and tendons. Dr. Solomon opined that McCullough was not likely to regain full function of the hand because the median nerve was partially severed.

5. When defense counsel began to question McCullough about the diary, the prosecutor objected on the grounds that the questions were leading, no "basis of her knowledge" was established, and the questions were "beyond the scope of the direct." Appellant's attorney claimed that McCullough's "destruction" of the diary "goes to her bias." The court overruled the objection, but cautioned defense counsel that he was "opening this up for this witness to say that this was a bloody diary of a horrible past that she wanted to forget and that she had no reason to keep it."

shattered. The police found McCullough "lying in a pool of blood. There was large amounts of blood on her, on the ground below her and coming down the stairs and on the walls." Officer Chucoski noted that there was also blood in the bedroom, where a knife was found on the floor. He described McCullough as upset and in pain. Another officer asked McCullough who assaulted her, and she responded that "it was her husband, Andre Elliott."

Forensic Specialist Collette Sarns–Gaunt of the Montgomery County Police Department Forensic Services Section collected evidence from the house, including a kitchen knife, approximately eight inches long, found in the master bedroom, and "a diary or a journal located ... next to the bed .... in the master bedroom." Sarns–Gaunt testified that she took the diary because "diaries usually speak to the person's state of mind." Moreover, she explained that she believed she "had arrived on what was going to become a homicide," and "felt that [the diary] was important if the victim did not survive." She read parts of the diary and gave a copy of it to the lead investigator, Detective Erazo. Sarns–Gaunt also collected "a bathrobe with suspected blood," as well as swabs. of blood from the inside of the front door and where the victim lay just inside the front door. She explained that she "swab[s] blood mostly because blood is not usually present, so it seems out of place...."

Ms. Sarns–Gaunt also assisted in searching Elliott's car. Among other items, the police seized a New York Yankees hat.

Detective Kenneth Halter testified about the message left on Ms. McCullough's voice mail at 7:17 a.m. on February 5, 2006. He claimed he was familiar with Elliott's voice, and identified the voice on the message as Elliott's. After the attack, he played the message for Ms. McCullough; she identified Elliott's voice.

Forensic Specialist Kimberly Clements testified that the knife found in the victim's bedroom was examined for fingerprints; no latent prints of value were found. Forensic Biolo-

gist Erin Farr testified that the DNA profiles from the knife blade and the handle matched McCullough's DNA, not Elliott's DNA. She explained that the DNA from the blood on the knife could "mask or overpower ... the DNA from something of a lesser amount," i.e., the testing would only detect the DNA from the blood without detecting "some other kind of DNA."

After the State rested, appellant moved "for a judgment of acquittal on the first degree attempted murder charge" and "second degree, lesser included attempted murder." He alleged that the evidence of premeditation and specific intent to kill was insufficient for those charges, and submitted as to the other counts. The court denied the motion.

Appellant called Detective Ana Erazo, who worked for the Montgomery County Police Department's Family Crimes Division and was the lead detective on the case. She stated that the blood on the diary was not tested for Elliott's DNA. Detective Erazo received two copies of the diary from Ms. Sarns–Gaunt, but she did not read the diary.

Once the decision was made to return the diary to McCullough, Detective Erazo retrieved the original and returned it to the victim on March 6, 2006. Erazo returned the copies to McCullough on April 27, 2006. Detective Erazo did not direct Ms. McCullough to preserve either the diary or the copies. She testified that her understanding of the significance of the diary was that it may have been useful if Ms. McCullough had not survived; because she survived, the diary was no longer needed.

The following colloquy is relevant:

[APPELLANT'S COUNSEL]: And in investigations in the Family Crime[s] Division do you sometimes obtain copies of or originals of victim diaries?

[ERAZO]: No.

\* \* \*

[APPELLANT'S COUNSEL]: Are you aware whether there's a standard practice in the Family Crimes Division as to what to do when you do obtain a copy of a victim diary?

[ERAZO]: No. . . . We don't . . . have that I'm aware of in my unit within the Family Crimes. You've got to understand the Family Crimes has several different sections. And they're all very different crimes.

Erazo testified that she did not discuss the diary with McCullough. Although the diary "came up during one of the meetings that we had within my division with the State's Attorney's Office," no one informed her of its contents. And, as noted, Erazo claimed that she "didn't read it."

On cross-examination, the prosecutor asked Erazo about her "understanding of the significance of the journal." The detective replied: "We thought the victim was going to die and that would've been a good piece of evidence to have." She maintained that the State returned the diary "[b]ecause the victim . . . survived." The following exchange is relevant:

[PROSECUTOR]: [Y]ou need to investigate a case with a mind towards the State prosecuting its case if the victim does not want to testify.

[ERAZO]: That's correct.

\* \* \*

[PROSECUTOR]: And forensic evidence can be important in a case to show what happened, especially if the victim does not testify, is that correct?

[ERAZO]: Yes.

[PROSECUTOR]: And that could include evidence of a journal [or] DNA evidence if the victim does not testify, is that correct?

[ERAZO]: Yes.

On redirect, appellant's counsel asked Erazo whether the State had a meeting on March 22, 2006, "to consider what evidence to use if there was no victim cooperation." Erazo responded in the affirmative. The following ensued:

[APPELLANT'S COUNSEL]: Now you'd agree with me that the reason that victim diaries can be important for example in homicide cases is because it might give you some leads about the crime that was committed, correct?

[ERAZO]: Yes.

[APPELLANT'S COUNSEL]: It might tell you who did it, correct?

\* \* \*

[ERAZO]: In other cases, yes.

Appellant did not testify. The defense rested and "re-new[ed] it's [sic] motion for judgment . . . for the reasons previously stated and on the evidence submitted." The court again denied the Motion.

With regard to jury instructions, the court denied appellant's request for a spoliation instruction, pointing out that defense counsel never asked McCullough what she wrote in the diary, and observing that "there really isn't any evidence of spoiliation [sic] in this case." Defense counsel responded that the blood spatter on the diary was "an additional reason . . . why we think that the spoiliation [sic] instruction ought to be given." The court ruled: "Well, you're not going to get it for that reason. There was blood everywhere in this case and a substantial amount of it was tested."

In closing argument, defense counsel pointed out inconsistencies between McCullough's testimony and that of other witnesses, and argued: "She can't keep it straight, ladies and gentlemen, and those are the symptoms of a mistaken witness that's not telling the truth. She's wrong." Moreover, he noted that no DNA evidence linked appellant to the crime. According to defense counsel, it was "common sense in a case like this you would read the diary of a victim," yet the State had returned the diary and copies of it to McCullough, who "discarded" the diary and "destroyed" the copies. He contended that the State's "explanation for why they returned this diary doesn't hold water. . . ."

We shall include additional facts in our discussion.

### DISCUSSION

### I.

Appellant contends that the "court erred by failing to remedy the constitutional violations arising from the State's gender-based exercise of its challenges." As Elliott observes, the State "exercised the first six of seven strikes against men," and, in total, "exercised eight of its nine peremptory strikes (88.8%) against men...."[6] Moreover, appellant twice objected to the State's peremptory challenges against men. Relying on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny, he argues: "The trial court erred in empaneling a jury over objection after the State's admitted exercise of peremptory challenges on the impermissible basis of gender." Before reviewing the parties' contentions in detail, we pause to review what transpired below with respect to jury selection.

After the State had exercised seven of its ten allotted strikes,[7] the following ensued at the bench:

> [DEFENSE COUNSEL]: ... I'm not certain, but I believe the State used six of its seven ... strikes on men.... [T]he issue I'm raising is whether they've used a dispropor- tionate number of those strikes on men. I believe it may be

---

**6.** Appellant appended to his brief an affidavit of counsel, averring that, "[a]fter a number of potential jurors were struck for cause," twenty- three males and twenty-five females remained in the venire. However, we do not know the statistical gender composition prior to the strikes for cause. In any event, the State has not objected to the affidavit. It explains: "Upon review of the record, undersigned counsel was unable to locate the Jurors Reporting for Service list, which includes demo- graphic information, generated by the lower court. The prosecutor has a marked copy in her files." *See Bailey v. State*, 84 Md.App. 323, 331– 32, 579 A.2d 774 (to establish a pattern of discrimination, a party must provide percent of strikes directed against specific target group *and* percent that the group represents of the whole venire, and thereby show a "disproportionately heavy employment of peremptories against a target group out of line with what random selection would predict ... would happen to the group simply by the law of averages"), *cert. denied*, 321 Md. 225, 582 A.2d 531 (1990).

**7.** Ultimately, the State only exercised nine strikes.

six out of seven but I would need to consult the official records. I just don't want to waive the issue, Your Honor. That's all.

THE COURT: Very well. I'll consider that an objection. Overruled.

Twelve jurors and two alternates were seated. The following colloquy transpired at the bench, before the jury was sworn:[8]

[DEFENSE COUNSEL]: I just want to preserve the issue of using strikes on men . . .

THE COURT: Is there any specific reason[?]

[DEFENSE COUNSEL]: I believe they used all but one of their strikes on men. I would have to look at my notes to verify that.

[PROSECUTOR]: I'd actually like to respond to that point.

THE COURT: Yes, Go ahead, Madam State.

[PROSECUTOR]: First of all, they have to show a pattern of discrimination and they haven't. And I would also like to say that they used most of their strikes on women[9] and then when we started using our strikes, *we had a panel of men and felt the need to balance out the jury. So if we did use more strikes on men, it would be because we wanted a balanced jury, which I believe we have.* I guess it's more men than women on the jury now.

THE COURT: Yes. Okay. Very well.

[PROSECUTOR]: Thank you.

THE COURT: Thank you.

[DEFENSE COUNSEL]: Thank you, Your Honor. (Emphasis added.)

---

8. As best we can determine, four of the empaneled jurors were women, seven were men, and the twelfth juror's gender cannot be determined from the name. There were two alternates, both of whom were women.

9. The State never objected to the defense's strikes, nor did it particularize its contention as to the defense's alleged misuse of its peremptory strikes.

According to appellant, the State "proffer[ed] a patently gender-based explanation for its strikes against men" and "admitted that it was striking men *because they were men,*" which "was *not* gender-neutral, as required by *Batson.*" He argues that by its "admitted exercise of peremptory challenges on the impermissible basis of gender .... the State violated [the] constitutional mandates" of the United States Constitution and Articles 24 and 26 of the Maryland Declaration of Rights.

Pointing to "[t]he State's unfounded suggestion that defense counsel exercised gender-based strikes," appellant notes that "the State never raised a *Batson* objection." Moreover, he characterizes as "astounding" the "State's suggestion that one party's constitutional violation justifies another party's constitutional violation...." In his view, the State's "motive" to create a gender-balanced jury "does not cure" the State's *Batson* violation.

Appellant posits that "[t]he appropriate remedy for the State's *Batson* violation" is to "set aside his conviction." In his view, "a limited remand to determine whether a permissible rationale for the strikes existed is not appropriate," because there is no question whether the State had a gender-neutral rationale; "the State admitted that its peremptory strikes were gender-based."

The State counters that "Elliott failed to perfect his challenge to the State's use of peremptory strikes and he also acquiesced to the trial court's empaneling the jury without having ruled as to each challenged juror." Elaborating, the State observes that, "after the State responded, during the second exchange, to Elliott's stated belief that '[the State] used all but one of [its] strikes on men,' Elliott did nothing but say thank you to the judge." In its view, appellant failed to ensure "that the trial court considered his objection under the *Batson* three-part test as to each challenged juror. Elliott, in effect, acquiesced to the court's tacit action to overrule his numbers objection and has no basis for appealing those actions now."

Alternatively, the State claims that "the remedy of granting a new trial is not warranted when a limited remand would permit the trial court to conduct a proper hearing on the parties' respective claims of gender discrimination in the use of peremptory strikes." According to the State: "Each party should be required to show, as to each challenged juror, their respective prima facie case of alleged gender discrimination in juror selection," and "the State should be permitted to articulate its reasons for striking a juror...." In its view, "a limited remand would permit the trial court an opportunity to consider fully and properly, under the three-part test, the objection raised as to each challenged juror after the other (or striking) party has articulated its basis for exercising a strike against the juror."

Further, the State argues that even though it "stated a preference for a balanced jury, the State should be permitted the opportunity to demonstrate to the trial court whether it had legitimate permissible reasons for striking a particular juror." In this regard, the State maintains that if it struck a juror "for both permissible and impermissible reasons it would be up to the trial court to determine if the strike was appropriate or not.[1]"

In his reply, appellant insists that he preserved his *Batson* challenge because "the defense objected twice on *Batson* grounds, and ... the trial court twice considered, and twice rejected, the challenge." He reiterates that his objection to the State's exercise of its nine strikes "established a prima facie case because it demonstrated a pattern sufficient to support an inference of discrimination," in violation of federal and State law. Moreover, he argues that because "the State volunteered its explanation" for striking jurors, "the question whether a prima facie case of impermissible motivation has been established was moot." In that circumstance, argues appellant, "the defense no longer needed to prove that the State's strikes were gender-based once the State admitted that to be true."

In addition, referring to defense counsel's "thank you" remark, appellant claims that, "when defense counsel objects and is heard on a jury-based challenge, ultimate acceptance of or acquiescence to the empaneling of the jury does not result in waiver." He maintains that "counsel's 'thank you' merely indicated counsel's obedience to the court's overruling of the *Batson* objection." In the alternative, he asks this Court to "exercise its discretion to review the *Batson* challenge for plain error."

■ Preliminarily, we are satisfied that there is no merit to the State's contention that appellant failed to preserve his *Batson* challenge. We explain.

■ Maryland Rule 4–323(c), governing objections to non-evidentiary rulings, provides, in part: "For purposes of ... appeal of any ... ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court." Here, the record reflects that appellant twice objected on *Batson* grounds, and the trial court twice rejected his challenge. Notably, "[a] *Batson* objection is timely if the defendant makes it no later than when the last juror has been seated and before the jury has been sworn." *Stanley and Trice v. State,* 313 Md. 50, 69, 542 A.2d 1267 (1988). That is precisely what occurred here.[10]

We also reject the State's claim of waiver by acquiescence. First, as appellant points out, "[t]he suggestion that counsel risks waiving objections by maintaining a courteous and pro-fessional dialogue with the court is at odds with the legal profession's standards of conduct." *See* Md. Rules of Prof'l

---

10. As noted, after the State's exercise of its first seven strikes, defense counsel stated: "[T]he issue I'm raising is whether they've used a disproportionate number of those strikes on men. . . . I just don't want to waive the issue, Your Honor." The trial court overruled the objec-tion. At the end of jury selection, but before the jury was sworn, appellant said: "I just want to preserve the issue of using strikes on men. . . . I believe they used all but one of their strikes on men." The court accepted the State's explanation that it "wanted a balanced jury."

Conduct, Preamble § 9 (lawyer must "zealously ... protect and pursue a client's legitimate interests ... while maintaining a professional, courteous and civil attitude toward all persons involved in the legal system"). Second, although defense counsel thanked the court after it heard argument on the State's use of its jury strikes, defense counsel's response " 'was merely obedient to the court's ruling and obviously [was] not a withdrawal of the prior *[Batson]* objection....' " *Ingoglia v. State*, 102 Md.App. 659, 664, 651 A.2d 409 (1995) (concluding that "acceptance" of venire panel did not waive earlier challenge to court's refusal to pose a particular voir dire question) (citation omitted); *see Miles v. State*, 88 Md. App. 360, 377, 594 A.2d 1208 (concluding that defense counsel's statement, " 'my client and I are satisfied with the selection process,' " did not waive prior objections regarding voir dire, *cert. denied*, 325 Md. 94, 599 A.2d 447 (1991)). Notably, in contrast to *Gilchrist v. State*, 340 Md. 606, 618, 667 A.2d 876 (1995), in which the defendant's "attorney said that the second jury panel was 'acceptable,' " defense counsel did not affirmatively represent that the jury was acceptable.

 We turn to the merits. In the landmark case of *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court examined peremptory challenges and held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" To the contrary, a "defendant [has] the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." *Id.* at 85–86, 106 S.Ct. 1712. The underlying purpose of *Batson* and its progeny is to protect the parties' right to a fair trial; the venire person's right not to be excluded on an impermissible, discriminatory basis; and to preserve public confidence in the judicial system. *Powers v. Ohio*, 499 U.S. 400, 404, 406–09, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).[11]

---

**11.** However, there is no "freestanding" federal constitutional right to peremptory challenges. *Rivera v. Illinois*, ──── U.S. ────, 129 S.Ct. 1446, 1453, 173 L.Ed.2d 320, 329 (2009). *See United States v. Mar-*

In *Tyler v. State*, 330 Md. 261, 623 A.2d 648 (1993), the Court of Appeals extended the rationale of *Batson* to sex-based peremptory strikes as a matter of State constitutional law. It said, *id.* at 270, 623 A.2d 648:

> The equality of rights under law, without regard to gender, bestowed by Art. 46 of the Maryland Declaration of Rights, flowing through the equal protection guarantees of Art. 24 of the Maryland Declaration of Rights to *Batson v. Kentucky*, 467[476] U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), prohibits the State in a criminal prosecution from using peremptory challenges so as to exclude a person from service as a juror because of that person's sex.

Subsequently, in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Supreme Court reached the same result. It determined that the Equal Protection clause "forbids peremptory challenges on the basis of gender," because "gender, like race, is an unconstitutional proxy for juror competence and impartiality." *Id.* at 129–30, 114 S.Ct. 1419, 128 L.Ed.2d 89.

In evaluating a claim that peremptory challenges were exercised in an impermissibly discriminatory manner, trial courts must follow a three-step process. *See Miller–El v. Cockrell*, 537 U.S. 322, 328–29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Hernandez v. New York*, 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Parker v. State*, 365 Md. 299, 308, 778 A.2d 1096 (2001); *Whittlesey v. State*, 340 Md. 30, 46–47, 665 A.2d 223 (1995), *cert. denied*, 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996). The Court explained in *Gilchrist*, 340 Md. at 625–26, 667 A.2d 876 (some citations omitted):

---

*tinez–Salazar*, 528 U.S. 304, 311, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). Rather, such rights are "a creature of statute." *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Therefore, a state may opt not to provide for such challenges. *Rivera*, 129 S.Ct. at 1453–54, 173 L.Ed.2d at 329; *Georgia v. McCollum*, 505 U.S. 42, 57, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

First, the complaining party has the burden of making a *prima facie* showing that the other party has exercised its peremptory challenges on an impermissibly discriminatory basis, such as race or gender....

Second, once the trial court has determined that the party complaining about the use of peremptory challenges has established a *prima facie* case, the burden [of production] shifts to the party exercising the peremptory challenges to rebut the *prima facie* case by offering race-neutral explanations for challenging the excluded jurors. The "explanation must be neutral, related to the case to be tried, clear and reasonably specific, and legitimate." *Stanley v. State*, 313 Md. 50, 78, 542 A.2d 1267, 1280 (1988). The reason offered need not rise to the level of a challenge for cause. "At this step of the inquiry, the issue is the facial validity of the ... explanation." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 406 (1991). It is insufficient, however, for the party making the peremptory challenges to "merely deny[ ] that he had a discriminatory motive or ... merely affirm[ ] his good faith." *Purkett v. Elem*, [514 U.S. at 769,] 115 S.Ct. at 1771.

Finally, the trial court must "determine[ ] whether the opponent of the strike has carried his burden of proving purposeful discrimination." [*Id.* at 768,] 115 S.Ct. at 1771. This includes allowing the complaining party an opportunity to demonstrate that the reasons given for the peremptory challenges are pretextual or have a discriminatory impact. It is at this stage "that the persuasiveness of the justification becomes relevant...." [*Id.*] "At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." [*Id.*]

██ As noted, the first step requires the party claiming discrimination in the jury selection process to make "a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94, 106 S.Ct. 1712. The "[r]elevant circumstances that 'might give rise to or support or refute' such showing include 'a "pattern" of

strikes against . . . jurors [of the cognizable group] in the particular venire. . . .' " *Mejia v. State*, 328 Md. 522, 533, 616 A.2d 356 (1992) (citation omitted). The fact that the persons struck are members of a cognizable group may be sufficient for a *prima facie* case, depending on "how, if at all, the State responded to the proffer or assertion" that the persons struck were members of that group. *Id.* at 534, 616 A.2d . 356.

Once the party challenging the use of peremptory strikes makes the requisite *prima facie* showing, the burden shifts in the second step to the striking party to articulate a neutral explanation for the exercise of the strikes. *Purkett*, 514 U.S. at 767, 115 S.Ct. 1769. Although "each strike," and the reason given for it, "must be examined in light of the circumstances under which it was exercised, including an examination of the explanations offered for other strikes," *Chew v. State*, 317 Md. 233, 245, 562 A.2d 1270 (1989), the Fourth Circuit has explained that *"Batson* . . . does not require *individualized* explanations for peremptory strikes. . . . [A] court may . . . find that the prosecutor has complied with *Batson* based on an overall explanation that is found satisfactory as to each of the challenged strikes." *Evans v. Smith*, 220 F.3d 306, 314 (4th Cir.2000) (emphasis added).

The third step "includes allowing the complaining party an opportunity to demonstrate that the reasons given for the peremptory challenges are pretextual or have a discriminatory impact." *Gilchrist*, 340 Md. at 626, 667 A.2d 876; *see Parker*, 365 Md. at 309, 778 A.2d 1096. "While the complaining party [bears] the . . . burden of proving unlawful discrimination," the trial court makes the ultimate determination as to whether the stated reasons were pretexts for discrimination. *Gilchrist*, 340 Md. at 626–27, 667 A.2d 876. Because the trial court's assessment of a *Batson* claim is factually intensive, we defer to its factual determination. *Id.* at 627, 667 A.2d 876. Such findings will not be overturned unless they are clearly erroneous. *Hernandez*, 500 U.S. at 364–65, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395; *Harley v. State*, 341 Md. 395, 402, 671 A.2d 15 (1996) (per curiam); *Gilchrist*,

340 Md. at 627, 667 A.2d 876; *Brogden v. State,* 102 Md.App. 423, 433, 649 A.2d 1196 (1994). Nevertheless, if "the relevant facts are not in dispute," the appellate court "may exercise [its] independent constitutional judgment to determine what should be concluded from those facts." *Mejia,* 328 Md. at 539, 616 A.2d 356; *see Stanley,* 313 Md. at 71, 542 A.2d 1267.

The State asserts that, "[e]xcept for merely stating the numbers, [appellant] articulated no other relevant facts, that in their totality, would demonstrate a discriminatory purpose by the State in exercising its peremptory strikes." It relies on *Ball v. Martin,* 108 Md.App. 435, 457, 672 A.2d 143, *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996).

In *Ball,* 108 Md.App. at 439, 672 A.2d 143, after defense counsel struck the only African–American venireperson, the plaintiff asserted a race-based *Batson* challenge. Following a *Batson* hearing, the court overruled the objection. *Id.* at 440, 672 A.2d 143. Then, the plaintiff stated: "I'm going to put one more thing on the record.... [A]ll of his strikes were of women." *Id.* The court did not hold another *Batson* hearing or otherwise address the plaintiff's assertion. *Id.* On appeal, the plaintiff challenged, *inter alia,* the court's failure to address the gender-based challenge. *Id.* at 438, 672 A.2d 143. This Court held that the plaintiff "waived any gender-based objection for failure to raise it." *Id.* at 457, 672 A.2d 143. Quoting from *Johnson v. Nadwodny,* 55 Md.App. 227, 238, 461 A.2d 67 (1983), the *Ball* Court explained, 108 Md.App. at 457, 672 A.2d 143:

> "[T]he judge did not expressly deny the motion and procedurally we find that the judge was never asked to rule upon the motion.... [I]t is the responsibility of the movant to bring them to the attention of the trial judge prior to the conclusion of the trial.... [W]e ... consider that she has waived her rights to have a ruling on it."

*See also Johnson v. Commonwealth,* 259 Va. 654, 529 S.E.2d 769, 780–81(Va.) ("The fact that the prosecution has excluded African–Americans by using peremptory strikes does not itself establish ... a prima facie case under *Batson.* A defendant also must identify facts and circumstances that raise an infer-

ence that potential jurors were excluded based on their race.") (citations omitted), *cert. denied,* 531 U.S. 981, 121 S.Ct. 432, 148 L.Ed.2d 439 (2000).

In our view, the State's reliance on *Ball* is misplaced. The defendant in *Ball* never responded to the plaintiff's allegation that he used his strikes against women. Here, the State responded, acknowledging that the reason for its strikes was, indeed, gender-based; it sought to create a gender-balanced jury.

*Mejia,* 328 Md. 522, 616 A.2d 356, is informative with respect to the import of undisputed facts in the context of a Batson challenge. In that case, the defendant was convicted of attempted rape and second degree assault by a jury that was empaneled after the court overruled his challenge to the State's exercise of a peremptory strike. *Id.* at 525, 616 A.2d 356. The defendant had alleged in his challenge that the defendant was Hispanic and the potential juror whom the State struck was the only Hispanic person in the venire. *Id.* at 528, 616 A.2d 356. The Court of Appeals "granted certiorari to consider what proof a moving party is required to produce to establish a *prima facie* case of purposeful discrimination against Hispanics." *Id.* at 525, 616 A.2d 356.

Noting that "neither the State nor the court expressed any disagreement with the petitioner's proffer of the preliminary fact that a venireperson was the only Hispanic in the venire," the Court concluded that "a *prima facie* showing of *that fact* was made." *Id.* at 539, 616 A.2d 356. Further, it determined that the defendant made a *prima facie* case of purposeful discrimination because the State struck the only Hispanic person in the venire. *Id.* However, because the trial court overruled the defendant's *Batson* challenge "without affording the prosecution the opportunity to provide racially neutral reasons" for its strike, the Court ordered a limited remand for the trial court to perform the proper *Batson* analysis.[12] *Id.* at 540–41, 616 A.2d 356.

---

12. As we discuss, in this case the State had an opportunity to offer an explanation. Therefore, a limited remand would serve no purpose.

We agree with appellant that "the first prong of *Batson*," which requires a *prima facie* showing of an improper peremptory challenge, is not at issue. This is because, in response to appellant's challenge, the State immediately volunteered its gender-based reason for its strikes. That concession relieved appellant of the obligation to prove that the State's strikes were gender-based. As the Court recognized in *Edmonds v. State*, 372 Md. 314, 332, 812 A.2d 1034 (2002), once the State "offered explanations for its peremptory challenges," the first prong of *Batson* was "moot" and therefore "not at issue." *See also Hernandez*, 500 U.S. at 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (recognizing that where prosecutor defended strikes without prompting, court had no occasion to rule and "preliminary issue of . . . *prima facie* showing [was] moot"); *Gilchrist*, 340 Md. at 628, 667 A.2d 876 (same). Alternatively, we agree with appellant that he satisfied the first prong "by pointing to a pattern—eight of nine strikes used against men—sufficient to support an inference of intentional discrimination."

As to the second prong of *Batson*, which required the State to provide a neutral reason for its strike, unrelated to race or gender, we again agree with appellant, who argues: "[T]he State's unambiguous admission that it exercised eight of its nine peremptory challenges because the challenged jurors were men and it preferred women to fill the remaining spaces so as to obtain a 'balance[d] jury' . . . directly violated *Batson's* second requirement because it was not gender-neutral[.]"

The question, then, is whether the State's desire to obtain a gender-balanced jury violated *Batson* and its progeny. We agree with appellant that the State's objective, however well intentioned, "was no more permissible than would be the exercise of a peremptory strike against a black prospective juror in order to ensure that the jury reflected the racial make-up of the community as a whole." *See* Heather K. Gerken, *Second–Order Diversity*, 118 HARV. L.REV. 1099, 1114 (2005) (stating that "*Batson* prohibits using peremptory chal-

lenges" to "remedy ... gender imbalances on individual juries").

In *United States v. Nelson*, 277 F.3d 164, 207–12 (2d Cir.), *cert. denied*, 537 U.S. 835, 123 S.Ct. 145, 154 L.Ed.2d 54 (2002), the United States Court of Appeals for the Second Circuit underscored that efforts to balance the composition of a jury nonetheless violate *Batson*, because such conduct requires exclusion of prospective jurors on a prohibited basis (i.e., religion or race). In *Nelson*, the defendant was acquitted on state criminal charges, and was later charged with federal hate crimes related to the fatal stabbing of a Jewish man. *Id.* at 170–72. The federal trial court believed that the state trial had resulted in an acquittal " 'because the ... jury did not represent the community,' " and decided that it would empanel a representative jury. *Id.* at 171–72 (quoting district court). Therefore, it replaced an excused African–American juror with another African–American juror, rather than the Caucasian first alternate, and it replaced another empaneled Caucasian juror with a Jewish juror, also selected out of order from the alternate list. *Id.* at 172. The court justified its action by reference to its desire for a balanced jury. *Id.*

The Second Circuit held that the exclusion of jurors based on race or religion was an "error ... made plain by the reasoning [of] *Batson*," that "could not constitutionally have been achieved at the instigation of the parties." *Id.* at 207. Of import here, it also said: "[A]lthough the motives behind the district court's race-and religion-based jury selection procedures were undoubtedly meant to be tolerant and inclusive rather than bigoted and exclusionary, that fact cannot justify the district court's race-conscious actions." *Id.*

As appellant points out, the Supreme Court "has signaled that use of a peremptory strike for the purpose of gender-balancing would not be constitutionally tolerable." He cites *Rice v. Collins*, 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), to support his assertion. There, the record seemed to suggest that "one of the prosecutor's aims in striking [the juror] was achieving gender balance on the jury," *id.* at 340,

126 S.Ct. 969 and the Supreme Court observed that the trial court "correctly, disallowed any reliance on that ground."[13] *Id.* at 336, 126 S.Ct. 969.

In our view, the State's explanation does not pass muster under *Batson.* The State had the burden of providing a gender-neutral explanation for its strikes. It failed to do so. Instead, it remarked that "when [the State] started using [its] strikes," there was "a panel of men," and it felt the "need to balance out the jury." By striking men to reduce the number of men on the jury, "a discriminatory intent [was] inherent in the prosecutor's explanation," and that explanation could not be deemed gender-neutral. *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859. "No matter how noble [the State's] intentions, such a strategy would offend *Batson....*" *United States v. Stephens,* 421 F.3d 503, 524 (7th Cir.2005) (Kanne, J., dissenting). *See Nelson,* 277 F.3d at 207–12 (noting that "jurymandering" violates *Batson*). Therefore, the court erred in denying appellant's challenge to the empaneling of the jury.[14]

---

**13.** It is also noteworthy that, in his dissent in *Evans v. State,* 396 Md. 256, 914 A.2d 25 (2006), *cert. denied,* —— U.S. ——, 128 S.Ct. 65, 169 L.Ed.2d 53 (2007), Chief Judge Bell observed that *Batson* precludes the use of peremptory strikes for the purpose of " 'trying to get a jury which roughly reflects the composition of a cross-section of the county,' " *id.* at 390, 914 A.2d 25 (quoting trial court), even though that may seem "benign." *Id.* at 392, 914 A.2d 25. The majority did not suggest it disagreed with that view. *Id.* at 284, 914 A.2d 25.

**14.** We note that several courts have upheld peremptory strikes based on race or gender so long as the strikes were also motivated by a permissible factor. In *Jones v. Plaster,* 57 F.3d 417, 421 (4th Cir.1995), for example, the Fourth Circuit said:

If the court concludes, or the party admits, that the strike has been exercised in part for a discriminatory purpose, the court must consider whether the party whose conduct is being challenged has demonstrated by a preponderance of the evidence that the strike would have nevertheless been exercised even if an improper factor had not motivated in part the decision to strike. *See Howard v. Senkowski,* 986 F.2d 24, 26–30 (2d Cir.1993). If so, the strike stands.

*See also Gattis v. Snyder,* 278 F.3d 222, 235 (3d Cir.) (same), *cert. denied,* 537 U.S. 1049, 123 S.Ct. 660, 154 L.Ed.2d 524 (2002); *Wallace v. Morrison,* 87 F.3d 1271, 1274–75 (11th Cir.) (same), *cert. denied,* 519 U.S. 1044, 117 S.Ct. 616, 136 L.Ed.2d 540 (1996); *United States v. Darden,* 70 F.3d 1507, 1531 (8th Cir.1995) (same), *cert. denied,* 517 U.S.

 We must next determine whether to remand for a *Batson* hearing. *Tyler*, 330 Md. 261, 623 A.2d 648, provides guidance. In that case, the defense "challenged the composition of the jury" on the grounds of race and gender. *Id.* at 267, 623 A.2d 648. Although the trial court refused to consider the gender grounds, the prosecutor "acknowledged his purpose," stating: " 'I was trying to get ... more men....' " *Id.* at 268, 623 A.2d 648. The trial court denied the *Batson* challenge, ruling that the prosecutor "has not unconstitutionally or impermissibly used his peremptory [challenges] based on race[.]" *Id.* The jury convicted Tyler. *Id.*

On appeal, Tyler alleged a violation of his equal protection rights based on the court's denial of his *Batson* challenge. *Id.* at 263, 623 A.2d 648. The State "conceded that '[t]here is no doubt that the prosecutor did strike women jurors on the basis of their gender....' " *Id.* at 268, 623 A.2d 648. The Court observed that "the trial judge flatly rejected defense counsel's objections to the prosecutor's peremptory challenges based on gender discrimination without requiring the prosecutor to explain his conduct," as required under *Batson. Id.* at 270–71, 623 A.2d 648. It declared that, "under Maryland constitutional law, the State may not use peremptory challenges to exclude potential jurors because of their gender." *Id.* at 266, 623 A.2d 648.

The *Tyler* Court recognized that "the prosecutor's remarks in explaining his use of peremptory challenges with respect to race made perfectly clear that his use of peremptory challenges to exclude women from the jury were gender motivated and, therefore, contrary to Maryland constitutional law."[15] *Id.*

---

1149, 116 S.Ct. 1449, 134 L.Ed.2d 569, *cert. denied,* 518 U.S. 1026, 116 S.Ct. 2567, 135 L.Ed.2d 1084 (1996); *Guzman v. State,* 85 S.W.3d 242, 244 (Tex.Crim.App.2002) (same). But *see Robinson v. United States,* 890 A.2d 674, 681 (D.C.2006) (holding that "the exclusion is a denial of equal protection and a Batson violation if it is partially motivated as well by the juror's race or gender").

We need not determine whether the cases cited above have any application here. This is because the State never suggested any permissible basis to justify its strikes of the men.

**15.** The *Tyler* Court differentiated *State v. Gorman,* 324 Md. 124, 596 A.2d 629 (1991), observing that "a majority of [the *Gorman*] Court

at 271, 623 A.2d 648. The Court concluded: "In the face of what the prosecutor said at trial, he is not entitled to come forward at this time in an attempt to present a neutral explanation for challenging women jurors. Tyler [is] entitled to a new trial without further ado." *Id.*

In *Mejia*, 328 Md. at 540–41, 616 A.2d 356, as we have seen, the Court ordered a limited remand because the State was not afforded an opportunity to explain the basis of its strikes. That is not the situation here. Here, the prosecutor stated that, "when we started using our strikes, we had a panel of men and felt the need to balance out the jury." The prosecutor added: "[W]e wanted a balanced jury."

Because the State acknowledged its gender-based motives, a limited remand is neither necessary nor appropriate. The State is not entitled to a second chance to provide a gender-neutral explanation. Rather, Elliott is "entitled to a new trial without further ado." *Tyler*, 330 Md. at 271, 623 A.2d 648.

## II.

Upon retrial, the issue pertaining to the diary is likely to arise again. Therefore, we shall address it for the benefit of the parties and the court.

Referring to the diary, appellant argues: "The trial court erred in refusing to dismiss the indictment based on the State's intentional non-preservation of evidence." We pause to review additional facts.

On August 11, 2006, appellant filed a request for discovery. He sought "discovery and inspection [of][a]ny material or information tending to negate the guilt of the Defendant as to any offense charged," and made a "specific demand," *inter alia*, for "[a]ll evidence going to the lack of credibility of any government witness...." At a hearing on December 27,

---

agreed to remand the case to give the prosecutor an opportunity to supply race-neutral reasons for the exercise of his peremptory challenges to exclude African-American venire persons from jury service." 330 Md. at 271, 623 A.2d 648.

2006, appellant moved to compel the production of the diary recovered at the scene. The court denied the motion, because the diary no longer "exist[ed]," in that it had "been thrown away" by the victim.

Thereafter, appellant moved for sanctions on February 28, 2007, alleging:

> The State in this case has allowed exculpatory evidence to be destroyed. At issue is the complaining witness' diary, which was found at the scene of the crime covered with blood spatter. The blood spatter was not tested by the State, and the Defense was denied the opportunity to test the blood spatter due to the destruction of the diary by the complaining witness after having the diary returned to her by detectives in this case with the State's attorney's approval. In addition, the contents of the diary could have been exculpatory under a number of different theories of the Defense case.

Appellant pointed out that the diary was "logged into evidence," and that he had "requested the diary ... during the December 27, 2006, Motions Hearing." He complained that "the original diary and a photocopy of the diary contents were returned to Ms. McCullough" because the State " 'did not need it,' " and McCullough then "shredded the copy of the diary and disposed of the original diary." Therefore, he asked the court to dismiss the indictment, disqualify McCullough, and instruct the jury "that exculpatory evidence was destroyed in this case by the State and that the destroyed evidence should be viewed in favor of the Defense."

The court held an evidentiary hearing on July 20, 2007, with respect to the Motion for Sanctions.[16] Appellant called Sarns–Gaunt and questioned her about the search of McCullough's

---

16. The court had initially granted appellant's Motion for Sanctions in an Order issued on March 8, 2007 (docketed March 13, 2007). However, the State filed an opposition to the motion on March 16, 2007. Then, on March 20, 2007, it filed a Motion to Vacate Order, insisting that it had timely filed its opposition. On March 23, 2007, the court vacated its "Order granting sanctions."

home on February 5, 2006. Sarns–Gaunt testified that she thought the diary had evidentiary value because "it spoke to the emotional state of the victim prior to the event." Sarns–Gaunt photocopied the diary and read it. Although Sarns–Gaunt did not "remember the exact details" or the "wording" of the diary passages that she read, she "got the impression that the victim was in fear of her safety." When asked if she discussed the diary with anyone in the police department, Sarns–Gaunt recalled only that she drew it to the "attention" of one of the detectives.

Appellant's counsel then stated to the court: "We're learning for the first time ... that the State actually did read it. We've always believed and been led to believe, I'm not suggesting it was dishonest, but that nobody read the diary." He asserted that the diary was "a piece of evidence that we would very much like to have and we don't have." The court responded:

[W]hat this is shaping up as is both the prosecutors and the police are being accused of misconduct.... That's a pretty serious allegation that you have a heavy burden to prove. And if there is any misconduct here, it will be dealt with ... swiftly and appropriately. But I'm not going to allow a fishing expedition to see if there was prosecutorial misconduct.

The defense called Lieutenant James Humphries, Deputy Director of the Montgomery County Police Department's Family Crimes Division, and asked about the "standard practice" concerning diaries recovered from a crime scene. He replied: "The standard practice is, if they're taken as evidence, generally speaking, they would be reviewed by the investigating officer to see whether or not they have any type of evidentiary value."

Defense counsel also called Ms. McCullough, who testified that she wrote about appellant and "[n]othing else" in her diary. McCullough claimed, consistent with her later trial testimony, that she "threw [the diary] away" and "shredded" the copies. She explained that she "needed to quickly remove

[her] property . . . from the home so that [she] could put it on the market to sell it. . . ." Asked why she did not write about anyone but appellant in her diary, McCullough explained:

> I wrote about things that were on my mind. And I, he had isolated me, and was very controlling, and had ran pretty much everyone out of my life, so that any thoughts that I might have had were only of him. In addition to that, I was going through so much, so much trouble, you know, dealing with him in a relationship, and that was the only thing on my mind.

Appellant's counsel also called Detective Erazo, who testified: "I went through all the paperwork in the envelope [containing the diary], and I put the copy of the journal in my case file." Erazo returned the diary to McCullough, indicating that the State "didn't need it and she could have it back if she wanted it." Erazo acknowledged that the diary was discussed on February 16, 2006, at "a meeting in reference to the case," attended by the prosecutor, Lieutenant Humphries, and others. She elaborated:

> We were going through what evidence and things that we had for the case. And when the journal came up, I asked if they wanted it returned or anything done with it. And they said, "Just go ahead and return it." Ms. Koch and Ms. Chase discussed it and then gave me the release.

With regard to the contents of the diary, appellant's counsel argued:

> I think the inference to be drawn from the fact that the journal and the copies were given to her, at the initiation of the police, I think the inference is inescapable that that was so that I as the defense lawyer for Mr. Elliott, or whoever else was defending him, wouldn't be able to see it. . . . I'd love to be able to read that, but I don't have it now.

\* \* \*

Ms. McCullough does not remember everything she wrote down. There might be inconsistent statements. Her diary might tell us who really did this. It might tell us how much

she hated Andre Elliott. It might tell us about her own psychological issues, relationships that she had with others.

As to the blood on the diary, appellant's counsel insisted that, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Williams,* 392 Md. 194, 896 A.2d 973 (2006), it would be "exculpatory if it's not Mr. Elliott's blood.... And we don't have a chance to test that.... [I]t could have been the blood of the real perpetrator."

The State countered:

[T]he purpose of that meeting at that time was to go through all of the evidence, because there was a lot seized, fully understanding that we probably would not need all of the evidence seized, but to sort of run through and figure out what evidence we would need....

At that time, you heard testimony, Detective Erazo said to us do you need the diary, they've seized the diary. It was seized because at that time they believed that they were processing a murder scene....

... Ms. Chase and I conferred. The decision was made, as is often made, we do not need the diary. So because no one had read the diary, to our knowledge, Detective Erazo was told she could return the diary to the victim.

\* \* \*

... [C]ertain pieces of evidence have different evidentiary value when you have a life [sic] victim versus a dead victim. A live victim can speak for herself.... A diary speaks for a dead victim.... A diary would be inadmissible, most likely, with a live victim.

\* \* \*

And the burden that they have is not that the diary may be exculpatory, and not that it may be material. They have to prove that it would have been material. Brady material is that it must be material to show, to proving that ... the defendant's not guilty.... And they just haven't done that.

With regard to the blood on the diary, the prosecutor said:

[T]he blood on the diary was consistent with all of the other blood within the room. That there were other pieces of evidence seized from the room that can and were tested. That the defense is saying that they did not have the ability to test the diary, test the blood on the diary. But they had the ability to test any other item seized from the room. They have chosen not to do so.

\* \* \*

... They've chosen not to test anything else. That gives us no reason to believe that they would have tested the diary, the blood on the diary.

In rebuttal, appellant's counsel said that he "didn't test the knife because to [his] knowledge that's the only other blood sample taken from the room. They tested it, and it did not have Mr. Elliott's DNA[.]"

The court ruled:

Well, I don't find that there's any bad faith in this case.

But that's not the end of the analysis. Prosecutors can engage in conduct that is not appropriate, and in those cases it's appropriate for the court to impose a certain sanction, even if there isn't bad faith.

\* \* \*

... What we have here is the possibility that there might have been some evidence that could have been exculpatory. If that were the standard, that argument could be made in virtually every single criminal trial, because there is always something collected on a crime scene that is not used in the trial. The prosecution, the State doesn't use every single item that is collected. It is not at all unusual that certain items are returned to victims, having been viewed as having no prosecutorial value.

... [T]hey don't know what was in the diary, any more than they know what the results would have been on other items in the room that were not tested.

\* \* \*

Now, with respect to the issue of prosecutorial misconduct, the court addresses that in DeLeon.[17] And I've already alluded to it, but let me just say with respect to prosecutorial misconduct generally, the court says, "actual prejudice must be shown before any sanction or reversal of a conviction can be properly imposed."

\* \* \*

And they talk about Brady. I'm not so sure that we even get to the issue of Brady here, because there's been no proffer, or no argument of what exactly it is that the government threw away.... This is just a belief that there could have been evidence in the journal that could have been exculpatory, but we don't know what it was, or even if there was any such evidence.

... I find that there would have to be an egregious violation of the discovery rules, and serious prosecutorial misconduct, for a court to dismiss an entire indictment....

\* \* \*

Not only do I find no bad faith, but I don't find any misconduct in this case.

\* \* \*

And so for those reasons, the motion for sanctions is denied....

Now, with respect to jury instructions, we will discuss that [at trial] with respect to whether or not the facts are such that an instruction on spoliation is appropriate....

With this background, we turn to the parties' contentions.

■■■ Appellant asserts that, by failing to preserve the diary as evidence, the State violated his due process rights, as articulated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); and *Patterson v. State,* 356 Md. 677, 696, 741 A.2d 1119 (1999).[18]

---

**17.** *See State v. Deleon,* 143 Md.App. 645, 795 A.2d 776 (2002).

**18.** In his Motion for Sanctions, appellant requested a jury instruction pertaining to the destruction of evidence. On appeal, he does not

According to appellant, "[t]he *Youngblood* doctrine permits a defendant . . . to establish a due process violation if (1) the item in question is 'potentially useful evidence' and (2) the State's failure to preserve it was in bad faith." He insists that "[t]he diary was such 'potentially useful' evidence" because "it was splattered with blood from the crime scene" and "the diary entries about Mr. Elliott might have been used to impeach Ms. McCullough, the State's key witness, for example, by revealing her motive to testify against Mr. Elliott." By photocopying the diary, argues appellant, "the Department treated it as important evidence." Further, he claims that, "by the State's admission, the evidence was the 'voice' of an essential witness who might not be willing to cooperate. . . ."

Claiming that bad faith can be established without "showing that the State acted with malice or intent to harm the defendant," Elliott offers many grounds to support his claim of bad faith non-preservation. In particular, he points to "the State's violation of and disregard for its duty to preserve evidence, its violation of protocol relating to preservation of evidence, and its internally inconsistent rationale for its decision to return evidence to a key witness. . . ."

In appellant's view, "the State's violation of standard protocol establishes bad faith." He argues that the State made a "conscious decision . . . to break protocol" and "discard" the diary "without ever having read the diary to determine whether the information contained therein was inculpatory, exculpatory, or neutral.[1]" According to appellant, "[t]he State had a clear and affirmative obligation to preserve materials that have potential evidentiary value," yet "the State . . . returned the diary based on the untested *belief* that it was not exculpatory." In appellant's view, "the State's conduct—its deliberate departures, on two occasions,[19] from police protocol regarding

---

specifically challenge the court's denial of a spoliation instruction. Instead, he focuses on the court's refusal to dismiss the charges and the alleged violation of his due process rights. Therefore, we shall not address the court's failure to instruct the jury on spoliation.

19. Appellant apparently refers to the State's initial decision to return the diary and its later decision to return the copies of the diary.

evidence preservation—indicates that the State did not want the diary to be available to Mr. Elliott during discovery."

Further, appellant complains that the State erroneously believed that "its duty to preserve collected evidence ceased once the State had accumulated the evidence it believed to be sufficient to prove its case...." Yet, he points out that it would not have been difficult for the Department to retain the diary, because it "was not sizable; it did not require refrigeration or other special storage conditions; and it was not contraband." With regard to the State's rationale "for its deliberate decision to return the diary," appellant posits: "The State's evolving account of what happened to the diary ... indicates that the State did not want to produce the diary in discovery." In his view, the State offered "shifting stories about how many copies of the diary there were, when they were returned to Ms. McCullough, whether anyone had read the diary, and who participated in meetings about the diary...." Further, appellant alleges that "the court applied an erroneous legal standard," by faulting appellant for not demonstrating the contents of the missing evidence.

As to his due process rights under *Brady*, appellant maintains that "the State was responsible for identifying and disclosing material, exculpatory evidence," such as the diary. He explains: "To establish a *Brady* violation, a defendant must demonstrate that the withheld evidence was 'favorable to the defense—either because it is exculpatory ... or because it provides grounds for impeaching a witness—and ... that the suppressed evidence is material.' " (Quoting *Conyers v. State,* 367 Md. 571, 597, 790 A.2d 15, *cert. denied,* 537 U.S. 942, 123 S.Ct. 341, 154 L.Ed.2d 249 (2002)) (Citations and quotation marks omitted). In his view, "the State effectively acknowledged that the blood-spattered diary would have been exculpatory," by asserting "that the blood on the diary was the 'same blood' as the blood on the knife, the testing of which excluded Mr. Elliott as the source[.]" He reiterates that "the diary could have been used to show Ms. McCullough's bias against Mr. Elliott or motive to testify against him" because McCullough testified at the motion hearing that she regularly wrote

about her " 'trouble' " with appellant. Moreover, appellant contends that "evidence of Ms. McCullough's motive to testify against Mr. Elliott ... 'may [have made] the difference between conviction and acquittal.' " (Quoting *Conyers*, 367 Md. at 606, 790 A.2d 15 (citations and quotation marks omitted)). He declares that "had the jury not credited Ms. McCullough's testimony, it would not have been able to convict."

The State counters: "The trial court properly refused to dismiss the indictment on the basis of alleged bad-faith non-preservation of evidence." It alleges that Elliott did not establish that the State acted in bad faith in regard to the non-preservation of the diary, because "nothing in the due process clause confers an 'absolute duty' on the part of the police 'to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " (Quoting *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333, 102 L.Ed.2d 281.) Moreover, the State maintains that "the diary was clearly not *Brady* material." It explains: "The possibility that there might have been some evidence that could have been useful to the defense is simply not enough to make the diary subject to *Brady*."

In addition, the State observes that Elliott had an opportunity at trial to question Ms. McCullough about the contents of the diary, yet he did not do so. Moreover, the State contends that it "is not required to test every item that had blood on it." It posits: "The fact that the blood on this one piece of evidence was not tested does not mean that the State acted improperly in the preservation of evidence. The blood on the diary was consistent with the blood found in the bedroom, including on the knife...." Further, the State points out that appellant "did not request to test the blood on other items that were seized."

▮ In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See Wilson v. State*, 363

Md. 333, 768 A.2d 675 (2001) (same). As the Supreme Court explained in *Strickler v. Greene,* 527 U.S. 263, 280–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), to establish a *Brady* violation a defendant must show: (1) the State suppressed or withheld evidence, whether inadvertently or willfully; (2) the evidence at issue was favorable to the defense, either because it was exculpatory, provided a basis for mitigation of sentence, or provided grounds for impeaching a witness; and (3) the suppressed evidence was material to the guilt or punishment of the defendant, thereby prejudicing the defendant.

To "ensure that a miscarriage of justice does not occur," the State is required to "disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial[.]" *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such disclosure requirements extend to "helpful impeachment evidence as well as directly exculpatory evidence on the merits. . . ." *Adams v. State,* 165 Md.App. 352, 359, 885 A.2d 833 (2005), *cert. denied,* 391 Md. 577, 894 A.2d 545 (2006); *see Conyers,* 367 Md. at 606, 790 A.2d 15 (recognizing that impeachment evidence may make the difference between conviction and acquittal). Nevertheless, "[t]he dismissal of an indictment is at the sound discretion of the trial court," which we review for an abuse of discretion. *State v. Lee,* 178 Md.App. 478, 484, 943 A.2d 14 (2008) (citation omitted).

In our view, appellant's reliance on *Brady* is misplaced. In that case, 373 U.S. at 84, 83 S.Ct. 1194, 10 L.Ed.2d 215, the prosecution failed to disclose exculpatory evidence before trial; the defense had no knowledge of the information.[20] Here, Elliott knew of the existence of the diary well before trial. To be sure, he did not know of its contents, and the diary was unavailable for testing, because the State did not preserve it.

---

**20.** In *Brady,* an extrajudicial statement given by the defendant's accomplice, admitting to the murder for which Brady was on trial, "was withheld by the prosecution and did not come to [Brady's] notice until after he had been tried, convicted, and sentenced, and after his conviction had been affirmed." 373 U.S. at 84, 83 S.Ct. 1194.

As discussed *infra*, it was not known whether the diary was exculpatory. Because the issue raised by appellant concerns the State's "failure to preserve potentially useful evidence," we shall examine the State's conduct under *Youngblood*, not *Brady*.

In *Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281, the defendant was charged, *inter alia*, with sexual assault of a ten-year-old boy. The prosecution "disclosed relevant police reports to [the defendant], which contained information about the existence of [a rectal] swab and the [victim's] clothing," as well as laboratory reports. *Id.* at 55, 109 S.Ct. 333, 102 L.Ed.2d 281. Although the swab and clothing were made available to the defendant, the prosecution did not refrigerate or freeze the clothing. *Id.* As a result, months later, when semen stains were discovered on the clothing, the criminologist could not obtain blood group substances or analyze the semen to determine the perpetrator's identity. *Id.* at 53–54, 109 S.Ct. 333, 102 L.Ed.2d 281.[21] The state appellate court reversed the defendant's convictions "on the ground that the State had failed to preserve semen samples from the victim's body and clothing." *Id.* at 52, 109 S.Ct. 333, 102 L.Ed.2d 281. The Supreme Court granted certiorari to consider, under the Due Process Clause, the prosecution's duty to preserve potentially useful evidentiary material. *Id.*

Recognizing that the State "complied" with *Brady* and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and noting that the prosecution made the physical evidence available to the defense, *id.* at 55, 109 S.Ct. 333, 102 L.Ed.2d 281, the Supreme Court considered whether there was "some constitutional duty over and above that imposed by cases such as *Brady* and *Agurs.*" *Id.* at 56, 109 S.Ct. 333, 102 L.Ed.2d 281. The Court distinguished the circumstances in which *Brady* applies, i.e., "when the State fails to disclose to the defendant material exculpatory evidence," and the circumstances of the case before it, which presented "the failure of

---

21. The defense never requested testimony of the swab or clothing, but relied on the defense that Youngblood was not the perpetrator. It presented testimony about "what might have been shown by tests performed on the samples shortly after they were gathered, or by later tests performed on the samples from the boy's clothing had the clothing been properly refrigerated." *Id.* at 54, 109 S.Ct. 333, 102 L.Ed.2d 281.

the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the result of which might have exonerated the defendant." *Id.* at 57, 109 S.Ct. 333, 102 L.Ed.2d 281. It concluded that when the contents of the evidence are unknown, because of the State's failure to preserve the evidence, a defendant's due process rights are violated upon proof that the prosecution acted in bad faith. *Id.* at 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281. The Supreme Court reasoned, *id.* at 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281:

The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it *could have been subjected* to tests, the results of which *might have exonerated* the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *[California v.] Trombetta,* [467 U.S. 479, 486, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)], that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, *see Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal

defendant can show bad faith on the part of the police, failure to preserve *potentially useful* evidence does not constitute a denial of due process of law. (Emphasis added.)

*Patterson,* 356 Md. 677, 741 A.2d 1119, illuminates the concept of bad faith. Patterson was charged with driving and narcotics offenses. *Id.* at 680, 741 A.2d 1119. In a search subsequent to his arrest, police recovered cocaine in the pocket of a jacket in the trunk of the car that Patterson was driving. *Id.* at 681, 741 A.2d 1119. At trial, Patterson sought to show that the jacket was not his by trying it on and demonstrating that it did not fit him. However, it was not available; the State only offered into evidence a photograph of the jacket. *Id.* at 681, 741 A.2d 1119. On cross-examination, it was established that "the jacket was never held as evidence by the police, that the jacket was not the kind of evidence typically held as evidence by their agency, and that neither officer was aware of the jacket's current whereabouts." *Id.* at 681–82, 741 A.2d 1119. The trial court denied Patterson's request for a spoliation instruction. *Id.* at 681, 741 A.2d 1119.

On appeal, Patterson alleged that the court erred in denying the spoliation instruction, and thereby denied him due process of law. *Id.* The Court of Appeals disagreed. *Id.* at 688, 741 A.2d 1119. Relying on *Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281, the Court said: "[T]here is no suggestion of bad faith on the part of the police. The officer testified that he dealt with the jacket according to standard police procedure. There was no evidence to the contrary." *Id.* at 697, 741 A.2d 1119. It elaborated, *id.* at 696, 741 A.2d 1119:

Petitioner offers no evidence that the police purposely suppressed or destroyed the jacket. The record reveals that the police accurately reported the existence of the jacket during the inventory search of the vehicle. While the defendant may have considered the jacket to be relevant evidence, there is little evidence that the police considered it to be evidence, and ever held it as evidence.... [N]ot only is there no evidence that the police destroyed the jacket, petitioner has not established what the police motive or intent behind destroying the jacket would be.

In the case *sub judice,* appellant suggests that the actual contents of the diary would have shed light on the victim's motive to testify against appellant. It is, of course, speculation that what McCullough wrote in her diary "might have exonerated the defendant." *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333, 102 L.Ed.2d 281. Sarns–Gaunt alone read the diary, "as [she] was copying" it, but she could not recall what she had read. The victim testified at the motion hearing on July 20, 2007, explaining that she wrote only about appellant and "[n]othing else," explaining that he "was very controlling" and she had "so much trouble ... dealing with him in a relationship...." Surely, passages to that effect are not exculpatory. Nor has appellant suggested any basis to believe that the diary included any information that would have provided a motive for the victim to fabricate her claim that it was appellant who stabbed her on February 5, 2006. To the contrary, the victim's "motive" in testifying against appellant was established by her clear recollection of the events of February 5, 2006.

It is also salient that appellant had the opportunity at trial to delve into the contents of the diary on cross-examination, but chose not to do so.[22] Nevertheless, appellant did establish that McCullough's diary was seized by the State, which later returned it to the victim, and that the victim destroyed it. Appellant then argued in closing that McCullough "destroyed" the diary, and that "common sense" required the State to read and preserve it.

It is also total speculation that the blood spatter on the diary was exculpatory. To be sure, the blood on the diary "could have been subjected to tests," *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333, 102 L.Ed.2d 281, such as DNA analysis. Yet, the blood on the diary was a far cry from the only blood at the crime scene. There was evidence that blood was found all over the bedroom where McCullough was stabbed; on the

---

**22.** As noted, the court overruled the State's objection to appellant's line of cross-examination about the diary, but explicitly told defense counsel he was "opening this up for this witness to say that this was a bloody diary of a horrible past that she wanted to forget and that she had no reason to keep it."

walls and the stairs of the house; and in the kitchen, where the victim was found with "large amounts of blood on her [and] on the ground below her." Although the knife, blood swabs from the inside of the front door, and from where the victim lay, as well as "a bathrobe with suspected blood," were collected from the crime scene, the State only tested the knife for DNA evidence. This suggests that the State did not return the diary to avoid testing it. And, of import here, given that appellant never asked the State to test any other evidence, there is no basis to credit his claim that he wanted to test the diary—the one item that happened to be unavailable.

Furthermore, there was no evidence whatsoever that the assailant was injured or bled during the attack. This makes it unlikely that any of the blood at the crime scene, including the blood on the diary, was that of the assailant. Put another way, the blood that was tested belonged to the victim; a test indicating that the blood on the diary was not appellant's would not have exonerated him.

The court below credited the State's claim that the diary was recovered in the event that McCullough did not survive the attack. As the prosecutor explained, the State collected "a lot" of evidence, "fully understanding that [it] probably would not need all of the evidence seized, but to sort of run through and figure out what evidence [it] would need." Similarly, Sarns–Gaunt testified, "I believed I had arrived on what was going to become a homicide," and she thought the diary "was important if the victim did not survive." With McCullough available to testify, however, the State did "not need the diary," and returned it to McCullough. *Youngblood* stated that "requiring a defendant to show bad faith on the part of the police ... limits the extent of the police's obligation to preserve evidence to reasonable bounds...." 488 U.S. at 58, 109 S.Ct. 333, 102 L.Ed.2d 281. The trial judge, as fact finder, determined that minor inconsistencies in the State's account of how or why it decided to return the diary were not sufficient to establish bad faith.

Nor did the State violate protocol in handling the diary. To be sure, Lieutenant Humphries testified that the "standard practice" for a diary recovered from a crime scene was for the investigating officer to review it for "any type of evidentiary value." Yet, Detective Erazo explained that the Family Crimes Division "has several different sections" to handle "very different crimes," and in her section there was no standard practice for handling such items.

In sum, the State's decision to return the diary and copies of it to McCullough was not proof of bad faith. The court below found that the State did not act in bad faith; that finding was not clearly erroneous. Without proof of bad faith, appellant did not establish a due process violation under *Youngblood.* We conclude that the court did not err or abuse its discretion in refusing to dismiss the charges.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL. COSTS TO BE PAID BY MONTGOMERY COUNTY.**