REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2390

September Term, 2014

_____

KEVIN COLLINI

v.

STATE OF MARYLAND

_____

Krauser, C.J.,
Berger,
Leahy,

JJ.

_____

Opinion by Krauser, C.J.

_____

Filed: February 24, 2016

Convicted, after a jury trial in the Circuit Court for Harford County, of first and second degree assault, Kevin Collini, appellant, presents two questions for our review:

I. Did the trial court err in remedying a *Batson* violation by seating a properly struck prospective juror instead of the prospective juror whom the court found was improperly struck?

II. If preserved, did the trial court impose an illegal sentence when it took into account Collini's invocation of his Fifth Amendment right to remain silent?

Because we conclude that the court erred in seating a properly struck prospective juror in an attempt to remedy a purported *Batson* violation, we shall reverse the judgment of the circuit court, which renders the second question posed by Collini—whether the trial court erred by imposing an illegal sentence—moot.

# I.

The testimony adduced at trial established that, at about 9:45 p.m., on the evening of October 20, 2013, a violent altercation took place between Kevin Collini, appellant, and his neighbor, Michael Folino. The two men were then occupying different and separate apartments in a house subdivided into separate living units. The incident erupted when Collini, upon returning home that evening, noticed that several political yard signs, which he had posted on the property, were gone. Then, seeking the whereabouts of the missing signs, he sent a text message to Folino, asking him whether he knew where the signs were. Folino, who had tossed the signs into a nearby woods earlier in the day, replied, in a text message, that he had removed the signs. In response to that bold admission, Collini threatened, by text message, that, if the signs were not returned, the

1

police would be called. What happened after that testy electronic exchange was, as the following recitation of relevant testimony discloses, vigorously disputed at trial.

Collini testified, at trial, that, after exchanging text messages with Folino, he was in his living room, using a box-cutter to trim some paper, when he heard a loud "banging" at his front door. After retracting the blade of his box-cutter and placing it in his pocket, he opened the door. Standing there, according to Collini, was Folino, wearing a "Buck knife" on his belt.

After a brief and angry exchange of words, Collini turned and re-entered his home, whereupon Folino purportedly followed him into his apartment and, there, physically assaulted him. That led to a struggle between the two men, during which Collini was repeatedly kicked and struck by Folino. It was, in the midst of receiving those body blows, testified Collini, that he pulled the box-cutter out of his pocket and sliced Folino's chest with it. Wounded, but still on his feet, Folino fled; and Collini, therefore, called "9-1-1" for help.

Folino's testimony, however, presented a very different version of what occurred that evening after the two men exchanged text messages. He testified that, roughly fifteen minutes after his text message exchange with Collini, he heard a "banging" at the front door of his apartment. When he opened that door, "somebody lunged at [him]," at which time Folino felt something "hit [him] in the chest." The attacker then turned around and ran out of the house into the yard. Now, realizing that his assailant was Collini, Folino, though wounded, gave chase. That chase ended when Collini ran back into his apartment.

2

But, moments later, Collini reappeared, holding a baseball bat and "some kind of razorblade or knife." When Collini then threatened to kill him, Folino "retreated" to his apartment and called "9-1-1." At the conclusion of that call, he went back outdoors and waited for help to arrive. While standing outside, he and Collini started shouting at each other, and that verbal exchange did not end until the police and paramedics arrived.

The only other witness to the incident who testified, at trial, was the tenant of the third apartment, Jacob Coldiron, whose testimony was consistent with Folino's version of events, to the extent that it established that the physical confrontation at issue occurred in front of Folino's apartment not Collini's. Specifically, Coldiron testified that, from his basement apartment window, he could hear yelling and saw a "pair of legs" standing outside of Folino's front door. He then observed two pairs of legs running away from Folino's door and towards the front of the house.

When the paramedics arrived, Folino was transported, by helicopter, to Shock Trauma at the University of Maryland Hospital Center, where it took more than thirty staples to close his chest wound. Responding police officers, after interviewing both Collini and Coldiron about what had occurred, placed Collini under arrest. Collini was ultimately charged with first and second degree assault and was subsequently found guilty, by a jury, of both offenses, though the latter offense was ultimately merged into the former. In any event, Collini was thereafter sentenced to a term of twenty-five years' imprisonment for first degree assault, with all but fifteen years of that sentence suspended.

## II.

In the process of selecting twelve jurors and three alternates, the defense exercised nine of its ten[1] peremptory challenges.  Of those nine challenges, six were used to strike prospective female jurors: 9, 10, 22, 30, 41, and 42.  At the time that Collini struck the last of those six prospective female jurors—that is, prospective juror 42—eleven people had been seated as jurors, and, as the record indicates, at least nine of those jurors were male.[2]  At that point, the State objected, claiming that the defense had improperly exercised its peremptory challenges by striking women, on the basis of gender, in violation of the Equal Protection Clause and in contravention of *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).[3]  The court thereupon turned to defense counsel and said, "We have only one female juror that is

---

[1] Because the most serious offense that Collini was charged with was first degree assault, MD. CODE ANN., CRIM. LAW § 3-202 (LexisNexis 2014), an offense that carries a maximum penalty of twenty-five years, he was entitled to ten peremptory challenges and the State was entitled to five.  Md. Rule 4-313(a)(3).

[2] Jurors 5, 13, 15, 16, 23, 24, 27, 31, 33, 38, and 39 were all seated on the jury when Collini struck prospective juror 42.  The record does not indicate the gender of jurors 13 and 33, because the court did not state the gender of those jurors as it did with respect to the other nine jurors.

[3] In *Batson*, the United States Supreme Court held that using peremptory challenges to exclude prospective jurors solely on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment.  476 U.S. 79.  Then, in *J.E.B.*, the Supreme Court extended *Batson* to prohibit the exercise of peremptory challenges on the basis of gender.  511 U.S. 127.

4

sitting." Then, referring to the prospective female jurors 9, 10, 22, 41, and 42, the court asked, "What are your reasons for striking [those] six individuals?"[4]

Defense counsel explained that he struck prospective juror 9 because she had been a juror in a previous trial, during which the defendant was found guilty of murder, and that he had struck prospective juror 10 because she had a friend, who had been murdered, and that, consequently, he was concerned that, "given that it [was] a violent assault, it would be a problem for her." Neither the State nor the court, challenged either of those explanations or, otherwise, questioned the propriety of the strikes in question. In fact, the State concedes, in its brief, "the court and State seemed to accept defense counsel's explanations for striking [prospective] jurors 9 and 10."[5]

Then, turning to prospective juror 22, defense counsel stated that he struck her because she "didn't answer any questions," asked by the court during voir dire, and that it was his policy to strike jurors who failed to do so. That explanation led to the following exchange between the court and counsel:

> [State]: Your Honor, number 13 answered no questions. That was a male and the defense did not strike him.
>
> * * *

---

[4] Although the court noted that defense counsel struck six females, the court, without explanation, discussed only five of the female prospective jurors during the *Batson* colloquy with defense counsel and the State.

[5] Specifically in its brief, the State stated that: "Although the court and the State seemed to accept defense counsel's explanations for striking jurors 9 and 10, the same cannot be said for jurors 22, 41, and 42."

[Defense counsel]: The reason I wanted juror 13 was because of his education level and the fact that he just appeared to be **analytical**. I didn't get that kind of vibe from 22.

[Court]: Number 22 was the dental hygienist.

[Defense counsel]: Yes.

(Emphasis added.)

The court, however, rejected, what it later described as defense counsel's

**"analytical versus nonanalytical"** explanation for striking prospective juror 22, stating:

I don't find that to be a nondiscriminatory reason, counsel . . . It appears there has been a pattern. The reason that you gave for striking that juror was because you strike jurors that don't provide any responses. However, the record does reflect that you have kept a male juror who did not provide any responses.

(Emphasis added.)

Then, as to the next prospective female juror—number 41—that was struck, the court asked defense counsel the basis upon which he had struck her, since she "did not provide any responses whatsoever" and had, in the court's view, an "analytical background," as she was a nurse. Defense counsel responded that, while prospective juror 41 admittedly had an "analytical background," he nonetheless struck her because the instant case not only involved "medical records," but those records were going to "[come] in by themselves," and that he did not want someone on the jury, "who has special knowledge about the records or impressions about treatment of people." Neither the court nor the State took issue with that explanation.

Finally, the court asked defense counsel, what was his "reason for striking the last one, number 42 who [was] still in the courtroom." Defense counsel responded that he

6

struck prospective juror 42 because, during voir dire, she indicated that jury duty would be a "financial hardship" for her, adding that he had thought that the court was going to strike her, along with several other prospective jurors, who indicated that it would be a "hardship" to serve on the jury. Neither the State nor the court directly responded or otherwise commented on defense counsel's explanation for striking prospective juror 42. The court, however, then ruled as follows:

> I do find that there has been a systemic striking of women by the defense. While some reasons that you have provided are nondiscriminatory, this last explanation that you provided to me concerning **analytical versus nonanalytical** [does] not make sense in light of some other individuals that you have selected. So, juror number 42 will be placed back on the jury.

(Emphasis added.)

## III.

Collini contends that the circuit court erred in seating prospective juror 42, whom the court had not found to have been improperly struck, instead of prospective juror 22, whom the court had found had been improperly struck. The State responds that no error occurred because the trial court did, in fact, find that prospective juror 42 was improperly struck by defense counsel, and thus seating that individual was an appropriate response to a *Baston* violation.

Peremptory challenges play a "vital role" in "insuring" that "an impartial jury is chosen." *King v. State Roads Comm'n of State Highway Admin.*, 284 Md. 368, 370 (1979). They "permit[] a party to eliminate a prospective juror with personal traits or predilections that, although not challengeable for cause, will, in the opinion of the

litigant, impel that individual to decide the case on a basis other than the evidence presented." *King*, 284 Md. at 370. To that end, parties are "given wide latitude" in exercising such challenges, which they may do "for any reason or indeed for no reason." *Gilchrist v. State*, 340 Md. 606, 619 (1995); *Brice v. State*, 264 Md. 352, 366 (1972).

"The right to exercise peremptory challenges, however, is not absolute." *Gilchrist*, 340 Md. at 620. It is, as the United States Supreme Court declared in *Batson v. Kentucky*, 476 U.S. 79 (1986), circumscribed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In *Batson*, the Supreme Court avowed that the Equal Protection Clause prohibits the use of peremptory challenges to strike prospective jurors on the basis of race. 476 U.S. 79.[6] This constitutional prohibition was later extended, by that Court, to proscribe the striking prospective jurors on the basis of gender in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).

The question before us, however, is not whether a *Batson* violation occurred, but whether the remedy chosen by the trial court to address that alleged violation was proper. As a trial court "has 'the discretion to fashion a remedy for [the] *Batson* violation that

---

[6] "The Supreme Court in *Batson* articulated a three-step process to be utilized by trial courts in assessing claims that peremptory challenges were being exercised in an impermissibly discriminatory manner." *Gilchrist*, 340 Md. at 625. First, "the complaining party" must make "a *prima facie* showing that the other party has exercised its peremptory challenges on an impermissibly discriminatory basis, such as race or gender." *Id*. Second, if the trial court determines that the complaining party has made such a showing, the party accused of employing unlawful peremptory strikes may "rebut the prima facie case" by offering a "facially valid, race [and gender] neutral explanation" for striking the excluded jurors. *Id*. at 625-26; *Edmonds v. State*, 372 Md. 314, 330 (2002). And, in the third and final step of the three-step process, the trial court must evaluate "whether the opponent of the strike has met his or her burden of proving purposeful discrimination." *Edmonds*, 372 Md. at 330.

addresses and resolves the specific harm caused by that violation,'" *Edmonds v. State,* 372 Md. 314, 331 (2002) (citing *Jones,* 343 Md. 584, 602-03 (1996)), we review the remedy, fashioned by the court below, for abuse of discretion. *Jones*, 343 Md. at 605.

## IV.

But, before we consider the propriety of the *Batson* remedy selected by the court below, we must first address the threshold question of whether the court actually found that prospective juror 42 was properly struck, as the State contends that it did not. Collini disagrees, and so do we.

The relevant portion of the *Batson* discussion began when defense counsel was asked by the court why he struck prospective juror 22, a dental hygienist. Defense counsel explained that prospective juror 22 did not appear to be "analytical," whereupon the court responded, "I don't find that to be a nondiscriminatory reason, counsel." Then, later on, near the end of the voir dire process, the court stated:

> I do find that there has been a systemic striking of women by the defense. While some reasons that you have provided are nondiscriminatory, this last explanation that you provided to me concerning **analytical versus nonanalytical** [does] not make sense in light of some other individuals that you have selected.

(Emphasis added.)

The court was clearly not referring to defense counsel's explanation for striking prospective juror 42 but to his earlier explication for striking prospective juror 22, as that was the only time that defense counsel explained his strike of a prospective juror by stating that the prospective juror in question—number 22—did not appear to be as

9

"analytical," and that, moreover, was the only time that the court questioned the striking of a prospective juror on that basis. In fact, the record shows that neither the State nor the court took issue with defense counsel's explanation for the striking of prospective juror 42.[7] We, therefore, agree with Collini that the trial court was clearly referring to the striking of prospective juror 22 when it opined that the "analytical versus nonanalytical" distinction did not "make any sense in light of some of the other individuals that you selected." Thus, the record shows that the trial court found that it was prospective juror 22 who was improperly struck and not prospective juror 42.

## V.

Having established that the court found that prospective juror 42 was not improperly struck, we turn to the question of whether it was appropriate to seat that prospective juror for a *Batson* violation involving prospective juror 22, whom the court had found was improperly struck by the defense. And, we begin this analysis by noting, once again, "the importance of the peremptory challenge," which the Court of Appeals has said, "requires that any significant deviation from the prescribed procedure that impairs or denies the privilege's full exercise is error that, unless waived, ordinarily will require reversal without the necessity of showing prejudice." *King*, 284 Md. at 371 (emphasis added).

---

[7] The State's response to Collini's explanation for striking prospective juror 42 merely consisted of: "Your Honor, I would submit that the Defendant has used seven out of his strikes, six of which were women, and that there are other people on the list." The State did not comment on the merits of Collini's explanation.

10

Here, Collini was denied the full use of his peremptory strikes when the court seated prospective juror 42, whom Collini had struck. And, though *Batson* does place limitations on the use of these challenges, the trial court's decision to seat prospective juror 42, a properly struck prospective juror, fails to achieve any of, what this Court has called, the "underlying purpose" of *Batson* that would justify abridging Collini's right to fully exercise the peremptory strikes allotted to him by law. *Elliott v. State*, 185 Md. App. 692, 711 (2009). Such a decision cannot be said to safeguard "the venire person's right not to be excluded on an impermissible, discriminatory basis," as there was no finding that juror 42 was struck on the basis of race or gender. *Elliott*, 185 Md. App. at 711. Nor can the decision be said to "protect the parties' right to a fair trial" or "preserv[e] public confidence in the system," as it placed an individual on the jury, whom defense counsel had previously struck. *Id*.

Moreover, the court below had other corrective measures at its disposal, which Maryland appellate courts have recognized as appropriate remedies for a *Batson* violation. Indeed, upon determining that a *Batson* violation had occurred, when prospective juror 22 was struck, the trial court could have seated that prospective juror (see *Chew v. State*, 71 Md. App. 681, 704 (1987)); or it could have recalled all of the previously struck jurors and restarted the jury selection process from before the pattern of improper striking began (see *Jones*, 343 Md. 584); or it could have seated one of the seven remaining prospective jurors that, according to the record, were still available; and finally, if the foregoing remedies were no longer available, the court could have

11

impaneled a new venire and begun the process of jury selection anew (see *Gilchrist v. State*, 97 Md. App. 55, 76 (1993); *Jones*, 343 Md. 584; *Chew*, 71 Md. App. at 704).

But, rather than choosing any of these remedies, which admittedly is not an exhaustive compilation of corrective measures, the court below chose, instead, to seat properly struck prospective juror 42, not because it found the strike that removed her from the venire was "unconstitutionally exercised," but to correct what the court believed to have been an unconstitutional striking of prospective juror 22. Therefore, because "the denial or impairment of the right to exercise peremptory strikes is reversible error without a showing of prejudice," *Whitney v. State*, 158 Md. App. 519, 532 (2004) (internal citations and brackets omitted), we conclude that the trial court abused its discretion in seating a prospective juror, who had been properly struck, and such error requires a reversal of the judgments below.

Finally, before we leave this issue, we feel impelled to take note of another troubling feature of the jury selection procedure conducted in this case. It appears that, when peremptory challenges were made, the exercise of those challenges occurred, according to the trial transcript, in "open court" and thus, presumably, before those prospective jurors that were ultimately struck. Consequently, the court's decision to seat a properly struck juror (number 42) placed, on the jury, an individual that knew she had been struck by the defense. She might have then assumed unfairly so in light of the

12

decision to seat her, notwithstanding defense counsel's strike.  Such an assumption might

have affected her view of defense counsel and possibly the defendant himself.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY REVERSED. COSTS TO BE PAID BY HARFORD COUNTY.**